**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| SCOTT A. KAMPAS, | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| and | ) | |
| | ) | |
| STEVEN S. HOFFMANN, | ) | Civil Action No. 4:22-cv-01057-SRC |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF ST. LOUIS, MISSOURI, | ) | *Counts: I, II, III, and IV* |
| | ) | |
| and | ) | |
| | ) | |
| P.O. KENNETH KEVIN KEGEL, | ) | *Counts: I, II, and III* |
| in his individual and official capacities, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| P.O. ERIC GERARD LARSON, | ) | *Counts: I, II, and III* |
| in his individual and official capacities, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| P.O. BRYAN LEBRADFORD LEMONS, | ) | *Counts: I, II, and III* |
| in his individual and official capacities, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| P.O. BENJAMIN NEIL HAWKINS | ) | *Counts: I, II, and III* |
| in his individual and official capacities, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| P.O. TIMOTHY JOHN MCNAMARA | ) | |
| in his individual and official capacities, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**FOURTH AMENDED COMPLAINT FOR DAMAGES**

1

COME NOW Plaintiffs Scott A. Kampas and Steven S. Hoffmann, and for and in support of their Fourth Amended Complaint against Defendants City of St. Louis, Missouri, Kenneth K. Kegel, Eric G. Larson, Bryan L. Lemons, Benjamin N. Hawkins, and Timothy J. McNamara state as follows:

## INTRODUCTION

Plaintiffs bring this civil-rights action against the City of St. Louis, Missouri, and five natural persons who were acting as police officers at all times relevant herein: Kenneth K. Kegel; Eric G. Larson; Bryan L. Lemons; Benjamin N. Hawkins; and Timothy J. McNamara, in both their official and their individual capacities, for violating their First Amendment right of freedom of speech; for retaliating against them for engaging in First Amendment-protected activity; for interfering with their right to observe and record police officers in public places; for unreasonably seizing and arresting them without probable cause; all while Plaintiffs were documenting the public protests following the not guilty verdict in the 1st Degree murder trial of Jason Stockley (the "*Stockley* Verdict").

The incidents in this claim arise from Plaintiffs' efforts, as legal observers and as private citizens to document, report on, and record ongoing protests relating to the *Stockley* Verdict. Defendants intentionally and willfully violated Plaintiffs' right to freedom of speech and right to be free from arrest without probable cause. Defendants specifically targeted Plaintiffs in an effort to halt and/or impede the documentation of police activity during the *Stockley* Verdict protests. In doing so, Defendant City of St. Louis continued their widespread, persistent custom of arresting groups of protesters and other bystanders without probable cause to believe that individuals who are being arrested have committed a crime.

2

## PARTIES

1.      Plaintiff Scott A. Kampas is a Missouri resident who lives in the City of Saint Louis, Missouri.

2.      Plaintiff Steven S. Hoffmann is a Missouri resident who lives in Saint Louis County, Missouri.

3.      Plaintiffs have each attended many dozens of public protests since 2014.

4.      Plaintiffs attend protests both as private residents of Missouri, who are deeply interested in ensuring that police respect the Constitutional rights of protesters, and as volunteer legal observers.

5.      Plaintiffs are known in the community for publicizing the results of their observations and documentation of police activity to others by conducting interviews with the media, and speaking about their experiences to public officials and to members of the public.

6.       Plaintiffs have also placed their observations about police activities into the public record by making written declarations in judicial proceedings, by testifying about their observations in courts of law, by giving depositions in civil proceedings, and by making official complaints to the Civilian Oversight Bureau.

7.      Plaintiffs have publicly advocated for a police department which acts in a constitutional way, which behaves within the confines of the law, and which respects the rights of individuals to engage in protests and other kinds of lawful speech.

8.      Plaintiffs were present in the City of St. Louis, Missouri on Tuesday, October 3, 2017, to document the public response to the *Stockley* Verdict, and the police response to those protests.

3

9.     On October 3, 2017, Plaintiffs were not participating with the other demonstrators or protesters, but Plaintiffs were observing what was happening, and gathering news about what was happening to share it with others.

10.     Plaintiffs believed that their presence at a protest would have a deterrent effect on any police officers who would violate the rights of persons protesting.

11.     Defendant the City of St. Louis, Missouri (hereinafter, "City of St. Louis") is a first-class city, and a political subdivision of the State of Missouri, duly organized under the Constitution of Missouri.

12.     The St. Louis Metropolitan Police Department (hereinafter "SLMPD") is an instrumentality of the City of St. Louis, Missouri organized and controlled pursuant to the Revised Statutes of the State of Missouri.

13.     Defendant Kenneth Kegel (hereinafter, "Kegel") is or was a police officer with the SLMPD. On information and belief, P.O. Kegel held the rank of "Major," and was further identified by Department Serial Number 1768.

14.     Kegel was acting in as Detail Commander on October 3, 2017.

15.     Kegel was the highest-ranking police officer present on the scene on October 3, 2017.

16.     Defendant Eric Larson (hereinafter, "Larson") is or was a police officer with the SLMPD. On information and belief, P.O. Larson held the rank of "Captain" and was further identified by Department Serial Number 4596.

17.     Larson was the Detail Deputy Commander on October 3, 2017.

18.     Larson was the second-highest ranking police officer present on the scene on October 3, 2017.

4

19.     Defendant Bryan LeBradford Lemons (hereinafter, "Lemons") is or was a police officer with the SLMPD. On information and belief, P.O. Lemons was further identified by Department Serial Number 11154.

20.     Defendant Benjamin N. Hawkins (hereinafter, "Hawkins") is or was a police officer or detective with the SLMPD. On information and belief, P.O. Hawkins was further identified by Department Serial Number 8934.

21.     Defendant Timothy J. McNamara (hereinafter, "McNamara") is or was a police officer with the SLMPD. On information and belief, P.O. McNamara was further identified by Department Serial Number 11013.

22.     At all times relevant herein, Defendants acted under color of the laws, statutes, ordinances, and regulations of state law.

23.     At all times relevant herein, except as explicitly stated, Defendants acted under the management, regulations, policies, customs, practices and usages of the SLMPD and/or the City of St. Louis pursuant to their authority as law enforcement officers.

## JURISDICTION AND VENUE

24.     Plaintiffs bring this claim pursuant to 42 U.S.C. § 1983, the Fourteenth Amendment to the United States Constitution, and the First and Fourth Amendments, as incorporated against the States and their municipal divisions through the Fourteenth Amendment.

25.     The jurisdiction of this Court is proper pursuant to 28 U.S.C. § 1331 because Plaintiffs' action arises under the Constitution of the United States and § 1343(a)(3) to redress the deprivation of rights secured by the Constitution of the United States.

26.     Venue is proper in the United States District Court for the Eastern District of Missouri pursuant to 28 U.S.C. § 1391(b)(2) because all of the events giving rise to the claims occurred in the City of St. Louis.

27.     Venue is proper in the Eastern Division because all of the events leading to the claims for relief arose in the City of St. Louis and Defendants actions were in the Eastern Division. E.D. Mo. L.R. 2.07(A)(1), (B)(1).

28.     Plaintiffs demand a trial by jury pursuant to Fed. R. Civ. P. 38(b).

## ALLEGATIONS COMMON TO ALL COUNTS

29.     In December 2011, then-St. Louis police officer Jason Stockley (who is white) shot and killed St. Louis resident Anthony Lamar Smith (who was African-American), whom Stockley and his partner had initially stopped on suspicion of involvement in a drug transaction.

30.     In May 2016, Officer Stockley was charged with first-degree murder for Smith's death.

31.     On Friday, September 15, 2017, after a four-day bench trial, a Missouri Circuit Judge acquitted Officer Stockley of first-degree murder.

32.     Following the announcement of the *Stockley* Verdict, public protests began at multiple locations in St. Louis and surrounding communities, some spontaneous and others more organized.

33.     SLMPD officers amassed at several protests wearing tactical dress, including helmets, and carrying batons, full-body riot shields, and chemical agents.

34.     On Tuesday evening, October 3, 2017, Plaintiff Kampas drove Plaintiff Hoffmann to north of where Jefferson Avenue crosses over Interstate 64 / U.S. Highway 40.

35.     Plaintiff Kampas parked, and Plaintiffs continued on foot on the sidewalks to the highway overpass.

36.     Plaintiffs stood next to reporter Rachel Lippmann of St. Louis Public Radio on the west sidewalk of Jefferson Avenue, observing a protest march which was proceeding east on the highway.

37.     Numerous police vehicles were also following the protest march on the highway.

38.     Plaintiffs were present on the sidewalk to observe and film the demonstrations and police response thereto, and to takes notes, which they intended to share with others to keep community members informed.

39.     Plaintiffs were not present as protestors nor were they participating in the protests – they were third-party observers.

40.     Plaintiffs had note or legal pads and pens with them while they were on the sidewalk.

41.     Plaintiff Hoffmann had a digital camera with him to take photographs.

42.     Plaintiffs wore bright neon green hats emblazoned with the words in a large font "National Lawyers Guild Legal Observer," as was their usual custom.

43.     When the protest march reached the Jefferson Avenue exit from the highway, the group of protesters exited the highway and proceeded north on Jefferson Avenue.

44.     Plaintiffs observed multiple police officers filming the assembled crowd.

45.     Plaintiffs crossed Jefferson Avenue and walked on the sidewalk proceeding north on Jefferson Avenue, observing the group of protesters and the police as they moved north.

46.     While walking on the Jefferson Avenue sidewalk, Plaintiffs did not observe anyone committing any crimes, vandalizing property, or making any threat of force or violence to officers or property.

47.     Plaintiffs did not observe or hear any officers order the group of protesters to disperse, and the scene was calm.

48.     Before Plaintiffs reached Market Street, Plaintiffs heard police officers tell the group to leave the street and go to the sidewalk, and the entire group of protesters moved onto the sidewalk.

49.     The entire group consisted of about 70 people.

50.     Immediately after the first group moved to the sidewalk, a separate group of about 30 people, who also appeared to be protesters, were traveling on foot west down Market Street.

51.     That group of 30 people turned left onto Jefferson Avenue, headed south, and the two groups merged into one group, on the sidewalk.

52.     Those 30 people who came from Market Street could not have been on the highway with the group of 70 people, because they came from an entirely different direction, and there would have been no time for them to exit the highway and appear on Market Street.

53.     At that point, about 100 people were now standing on the sidewalk.

54.     A large number of SLMPD officers followed behind the group of 30 people, walking on foot west down Market Street, and turned left onto Market Street, heading South towards the group assembled on the sidewalk.

55.     The SLMPD officers were dressed in "tactical" or "hard" gear, with body armor, shields, and batons, and were not dressed in the usual SLMPD "soft" uniform.

56.     Many of the officers were not wearing name tags, and had no visible identification numbers or other insignia to reveal their identity.

57.     A SLMPD officer wearing a "white shirt," which identified him as a high-ranking officer with supervisory authority, ordered the group of officers to form a line at the intersection of Market and Jefferson from sidewalk to sidewalk.

58.     People who had never been on the highway, but who were onlookers standing on the sidewalk, were pushed south by the line of officers.

59.     Another legal observer, Pamela Lewczuk, who had not been on the highway, was pushed south by the line of officers, into the group of protesters.

60.     Police told her "keep moving back, or you will get arrested too."

61.     The line of police all marched in unison, acting as a unit, south down Jefferson Avenue, so that they were facing the group of people on the sidewalk on the east side of Jefferson.

62.     Police also showed up to the south, and formed a police line south of the group of people on the sidewalk.

63.     Police officers surrounded the area on all sides, encircling protesters, legal observers, and members of the media, and prevented everyone from leaving, regardless of whether they were marching in the street or walking on the sidewalk.

64.     Police indiscriminately boxed everyone in, regardless of whether they had been on the highway or not.

65.     When a group of people are surrounded and encircled by police and not provided a means of egress, and the people who are trapped are prohibited from leaving, this is a law enforcement tactic referred to as "kettling."

9

66.     Defendants Kegel, Larson, Lemons, Hawkins and McNamara personally participated in the kettling, preventing anyone from leaving the area.

67.     Police officers, including the named defendants, used their bodies, their shields, their batons, and their bicycles to physically confine all of the people on the sidewalk, and prevent them from leaving the area.

68.     Police officers, including the named defendants, threatened to use physical force and violence against the people standing on the sidewalk.

69.     Some of the officers trapping the people in were carrying tactical or assault rifles in their hands.

70.     Immediately behind the group of people on the sidewalk was private property, being patrolled by police officers on bicycles, and those police officers told people that they would be arrested if they stepped onto private property.

71.     Police in the street shouted at the people on the sidewalk "move back, move back."

72.     There was nowhere for the people on the sidewalk to move back to, and police officers knew that, and could see that there was nowhere for them to move to, because the bicycle police immediately to the east of the sidewalk formed an impenetrable line with their bicycles, so that no person could exit the kettle.

73.     The police officers in the street were within hearing distance of the officers who were on private property. Both groups of officers could hear the conflicting orders that officers were giving.

74.     Police officers knew that their orders to move back were nonsensical and unreasonable, and that the people at whom they were directed did not have any way to comply with their nonsensical order.

75.     The people on the sidewalk shouted back "move where, move where?"

76.     The bicycle police were simultaneously ordering the people on the sidewalk to move into the street.

77.     The bicycle police knew that their orders to move into the street were nonsensical and unreasonable, and that the people at whom they were directed did not have any way to comply with their nonsensical order.

78.     Plaintiff Hoffmann noticed that police officers were smirking and laughing at the contradictory orders that police had given.

79.     The police officers gave purposely contradictory orders to Plaintiffs and the others on the sidewalk.

80.     Police officers knew that they were abusing their authority, they knew that their conduct was unprofessional and unreasonable, and they knew that no one was capable of following the orders that they had given.

81.     Plaintiffs were ready at all time to obey police orders. They would have moved from the sidewalk if police had ordered them to, and given them an egress to escape from the kettle, but they couldn't move, because police boxed them in and then gave them an order to "move back" onto private property where they had just been told they would be arrested if they stepped on private property.

82.     Police officers never gave Kampas of Hoffmann any orders or directions until after police had fully encircled them, so that there were no means of egress from the kettle.

11

83.     Before kettling everyone in, police officers never declared an unlawful assembly, and they never instructed Plaintiffs to disperse or move elsewhere.

84.     No reasonable person could have believed that the group of protesters on Jefferson Avenue were an unlawful assembly, because no crimes were being committed there, and because everyone was behaving peacefully.

85.     Immediately after the kettling occurred, Plaintiff Hoffmann verbally told several officers around him that he was never present on the highway and that he was not protesting, and that he was acting as a legal observer, and he asked if he could exit the kettle area.

86.     Plaintiff Hoffmann specifically told several "white shirt" officers, who are senior officers with supervisory authority, that there was no probable cause to arrest the Plaintiffs, because they had not gone onto the highway at any time, and had been on the sidewalk observing.

87.     One white shirt officer called another officer, presumably his supervisor or superior, on his cell phone, and told him that Plaintiff Hoffmann had told him that there were persons in the crowd, including both plaintiffs, who were never on the highway with the rest of the group.

88.     The officers who were commanding this incident knew that there were people inside the kettle, including the plaintiffs, who did not go onto the highway.

89.     Plaintiff Hoffmann's peaceful and lawful requests for himself and Kampas to leave the kettle area were ignored.

90.     The white shirt officers, including Defendant officers Kegel and Larson, directed the officers in tactical gear, and the bicycle officers, and other "arrest teams" to arrest everyone inside the kettle, regardless of whether they were on the highway or not.

12

91.     Suddenly, and without warning, two police officers rushed towards Plaintiff Hoffmann, seized him by his arms and back, and threw him face-first onto the ground, and cuffed his hands behind his body, causing pain to his shoulders, arms, and chest.

92.     At no point was Plaintiff Hoffmann resisting arrest, failing to comply, or posing a threat to any person.

93.     Plaintiff Kampas noticed that the arrest teams first singled out people holding cell phones and cameras, and people wearing neon-green hats, who were legal observers, and journalists for arrest.

94.     Police targeted legal observers, individuals who were filming, and journalists for arrest first, so that police could arrest everyone else without documentation of what they were doing.

95.     Police told journalists that they were arresting to "stop resisting" while they were not resisting.

96.     People who were filming had bright lights shined into their cameras by police, so that a glare would prevent those people from capturing images and video of the conduct of the police officers.

97.     Everyone who was inside the "kettle" was arrested, including Plaintiffs.

98.     At no time did Defendants attempt to ascertain whether the persons that they arrested were actually present on the highway or part of the protest, or whether there was probable cause to believe that they could be arrested for a crime.

99.     Defendants had ample opportunity and ability to tell whether Plaintiffs had ever walked onto the highway, or committed a crime, because they later noted in Incident Report CN 17-048640 that "surveillance was continually conducted on the protest group."

100.     It was clear, by the coordination of the actions of the officers in circling the group into a "kettle," and arresting everyone, regardless of whether there was probable cause for their arrest, that this tactic was planned and that senior officials of the SLMPD had notice of and sanctioned the conduct of the Defendants.

101.     Senior officials of the SLMPD were directing such actions and conduct and/or tacitly accepting and encouraging such conduct by not preventing officers from engaging in such conduct and by not disciplining them when they did engage in such actions and conduct.

102.     Defendant Timothy McNamara grabbed and handcuffed Plaintiff Kampas, and Kampas was placed in a van and transported to jail.

103.     Defendant Bryan LeBradford Lemons and other police officers placed Hoffmann in a van, for transport to jail.

104.     Defendants Kegel and Larson were supervising the actions of Defendants Lemons, Hawkins and McNamara.

105.     The officers—including Defendant Hawkins—who wrote, edited, and approved the arrest records and incident report falsely stated that Plaintiffs were observed on the highway.

106.     Plaintiffs were never observed on the highway because they were never on the highway.

107.     Officers within the SLMPD with supervisory and policymaking authority approved those arrest records and incident report.

108.     Officers within the SLMPD with supervisory and policymaking authority who approved those arrest records and incident reports either directed the officers who wrote the arrest records and incident report to falsify those records and/or they tacitly accepted and encouraged such conduct.

14

109.    After their arrest, Plaintiffs were held in the St. Louis City Justice Center for over 20 hours.

110.    On information and belief, officers within the SLMPD with supervisory and policymaking authority—including Defendants Kegel and Larson—directed City Justice Center staff to falsely imprison Plaintiffs, instructing them to "hold [sic] til 5 PM" the following day.

111.    Plaintiffs were put into locked rooms but were allowed to keep their property on their persons for several hours.

112.    From a cell at the Justice Center, Plaintiff Hoffmann gave a cellular telephone interview with a reporter from the St. Louis Post-Dispatch newspaper, expressing dismay that he had been arrested again without probable cause for his arrest.

113.    After many hours, Plaintiffs were offered sandwiches with slimy lunch meat that was visibly green with mold or other discoloration, and which smelled putrid.

114.    Plaintiffs were not provided toilet paper or soap when using the bathroom.

115.    Plaintiffs were not allowed to make phone calls to their attorneys, despite demanding to make phone calls to their attorneys.

116.    Those high ranking SLMPD officers purposely caused Plaintiffs to be held because they wanted to punish them, not because they had any legitimate law enforcement interest in confining them.

117.    Plaintiffs were told that they were being charged with "trespassing," and were released.

118.    No charges were ever brought against Plaintiffs.

119.    The SLMPD sent a press release with Plaintiffs' names and the locations of their homes to local news and media organizations, alleging that Plaintiffs trespassed on the highway.

15

120.    Some news and media organizations published the press release with the false information that the SLMPD had provided to them.

121.    Because of the publicity surrounding their false arrests, and because of the false statements in the press release, Plaintiffs suffered embarrassment, humiliation, invasion of their personal privacy, discomfort, and lost wages and income, and other harms.

## MUNICIPAL ALLEGATIONS

122.    The City of St. Louis has a continuing, widespread, persistent custom of arresting groups of protesters and other bystanders without probable cause to believe that individuals who are being arrested have committed a crime.

123.    The City of St. Louis has a custom of retaliating against protestors and other bystanders expressing disapproval of the actions of law enforcement officers, by arresting them.

124.    The City of St. Louis has practiced their custom of arresting individuals without probable cause and retaliating against individuals expressing disapproval of the actions of law enforcement officers on occasions before these particular protests, including:

 a.    On or around March 20, 2012, when dozens of SLMPD officers rushed a large group of protesters from behind after they complied with an order to leave a public park, and indiscriminately beat protesters with sticks and arrested at least 15 individuals who were peacefully crossing a street, while these individuals were committing no crime.

 b.    On or around May 24, 2012, in downtown St. Louis, when police arrested at least 10 individuals who were part of a march against police brutality, without any evidence that those arrested had committed any crime.

16

c. On or around October 12, 2014, at a QuickTrip convenience store on South Vandeventer Avenue in the City of St. Louis, police arrested at least 20 individuals who had marched to protest the police shooting and killing of Vonderrit Myers in the Shaw Neighborhood of St. Louis.

d. On or around September 17, 2017, in downtown St. Louis, the SLMPD conducted an infamous mass-arrest of over 100 people, including journalists, legal observers, and innocent bystanders. Numerous individuals were arrested there without probable cause.

e. On October 12, 2014, Plaintiff Hoffmann was arrested by Sergeant Kimberly Allen (also identified as No. 6178) in retaliation for attempting to make a complaint to SLMPD Internal Affairs about excessive force that he had witnessed there by police officers.

f. On April 14, 2019, Sharon Morrow was violently thrown to the ground, arrested and detained in the city jail by SLMPD officers Jacob Stein and Steven Ogunjobi for attempting to record police officers making arrests with her cellphone while she stood on the sidewalk in downtown St. Louis, and while there was no probable cause to believe that she was committing any crime. Upon her release from the City Jail, Morrow was ticketed for interfering with a police officer and resisting arrest, both of which were dropped without explanation before her court date.

125. On several occasions before the instant incident, the SLMPD arrested either Plaintiff Kampas or Plaintiff Hoffmann without probable cause to believe that they had committed any crime, in retaliation for exercising their right to observe and record the actions of police in public places, or in retaliation for reporting excessive force by police:

17

a. On May 24, 2012, Plaintiff Kampas was one of the individuals arrested without probable cause, held, released, and never charged.

b. On October 12, 2014, Plaintiff Hoffmann was one of the individuals arrested without probable cause, held, released, and never charged.

c. On September 17, 2017, Plaintiff Kampas was one of the individuals arrested without probable cause, held, released, and never charged.

126.    Following the September 17, 2017 arrests, Plaintiff Kampas reported to the Civilian Oversight Board that he saw Lieutenant Roger Engelhardt laughing at individuals who were being arrested without probable cause by lower-ranking SLMPD officers. At no time did Lieutenant Roger Engelhardt attempt to intervene, or to ensure that officers behaved in a Constitutional manner.

127.    In fact, Engelhardt laughed while officers beat, assaulted, and falsely arrested protesters. And Engelhardt has been a high-ranking official within Internal Affairs, and in charge of the Force Investigative Unit.

128.    The City of St. Louis has failed to supervise and train its officers to make arrests in a constitutional way, to permit recording of police actions, and to avoid restricting freedom of movement unjustifiably, and has been on notice that the lack of training and supervision have resulted in the deprivation of constitutional rights since at least 2012.

129.    The March 20, 2012 arrests without probable cause were actively encouraged by SLMPD Lieutenant Colonel Gerald Leyshock, who told the assembled officers "there are a lot of hard core anarchists in there, now go get 'em!"

130.    Those arrests were witnessed by Eddie Roth, a Special Assistant to the Mayor, who later became Director of Public Safety, overseeing the SLMPD.

131.    Mr. Roth was in a state of visible shock at the behavior he witnessed by police that night, and yet he did nothing to intervene or stop the officers, or to ensure that they were trained in the future to avoid making similar unconstitutional arrests.

132.    When Plaintiff Hoffmann pressed Mr. Roth to intervene on the scene, Mr. Roth told Hoffmann "the courts are always open to you," and he did not intervene as a high-ranking policymaking official, suggesting by his statement that the public should rely on litigation and the courts to be free from unconstitutional arrests.

133.    At no time did Lieutenant Colonel Leyshock attempt to intervene as SLMPD officers made arrests without probable cause, showing deliberate indifference or tacit authorization of such conduct by a high-ranking policymaking official.

134.    The October 12, 2014 arrests were personally overseen by Lieutenant Colonel Paul Nocherio, Major John Hayden (who soon after became Chief of Police), Sergeant Brian Rossomano, and Chief of Police Sam Dotson.

135.    Plaintiff Hoffmann spoke to Major John Hayden by telephone before he was arrested by Internal Affairs without probable cause, informing him of the excessive force that he had witnessed by police. Major John Hayden told Hoffmann to stay on the scene, so that Internal Affairs could take his statement.

136.    Internal Affairs arrested Hoffmann for attempting to make a statement.

137.    Major John Hayden either directed or encouraged Internal Affairs to arrest Hoffmann for making a complaint, or tacitly authorized Hoffmann's arrest, while knowing that there was no probable cause to make it.

138.    Police officers falsified the narrative and details of Hoffmann's arrest in their incident report, to cover up their arrest without probable cause.

139.    At no time did Nocherio, Hayden, Rossomano, or Dotson—all high ranking SLMPD supervisors—attempt to intervene as SLMPD officers made arrests without probable cause, showing deliberate indifference or tacit authorization of such conduct by policymaking officials.

140.    While the individuals falsely arrested on October 12, 2014 were being held in the City's Justice Center, persons who identified themselves as members of the Mayor's senior staff entered the Justice Center and addressed those who had been arrested as a group, apologizing for what had happened to them, and collecting written statements from them. These members of the Mayor's senior staff told those arrested that their statements would be used to "look into what happened to you."

141.    These high-ranking City officials then personally walked the entire group of people who had been arrested out of the front door of the Justice Center, releasing them.

142.    Hoffmann was never charged with a crime after his arrest.

143.    The arrests of September 17, 2017 were personally overseen by high ranking SLMPD supervisors Lieutenant Colonel Gerald Leyshock, Lieutenant Scott Boyher, Lieutenant Timothy Sachs, and Sergeant Brian Rossomanno, who at no time attempted to intervene as SLMPD officers made arrests without probable cause, showing deliberate indifference or tacit authorization of such conduct by policymaking officials.

144.    The arrests of Plaintiff Kampas and Plaintiff Hoffmann on October 3, 2017 were personally overseen by high ranking SLMPD supervisors Defendant Major Kenneth Kegel, Defendant Captain Eric Larson, Lieutenants Paul Piatchek, Scott Aubuchon, Scott Boyher, Daniel Chitwood, and Christi Marks, who were all classified as "Commanders" of the incident.

20

145.     At no time did Kegel, Larson, Piatchek, Aubuchon, Boyher, Chitwood, or Marks attempt to intervene as SLMPD officers made arrests without probable cause, showing deliberate indifference or tacit authorization of such conduct by policymaking officials.

146.     In fact, on October 3, 2017, Lieutenant Scott Boyher was personally directing police to arrest journalists who were present, knowing that police did not have any probable cause to arrest them.

147.     As a direct and proximate result of the actions of these Defendant as set forth herein, Scott Kampas and Steven Hoffmann have been damaged as a result of sustaining physical injury, pain and suffering, emotional damages, pain of the mind, including but not limited to mental anguish, inconvenience, humiliation, embarrassment, loss of enjoyment of life, stress, and loss of reputation.

## SLMPD HAS A HISTORY OF RETALIATING AGAINST LEGAL OBSERVERS AND ARRESTING THEM FOR ENGAGING IN FIRST AMENDMENT ACTIVITIES

148.     The SLMPD has known about the National Lawyers Guild and their legal observer program since at least 2015, and been aware of and familiar with their activities.

149.     Police officers know that the neon green hats that legal observers wear signify that the people who wear those hats document police activity, and will speak to others about the behavior of police at protests.

150.     At protests from 2015 until October, 2017, Plaintiffs have witnessed police officers asking legal observers questions about their activities as legal observers, engaging in conversations with Plaintiffs and other legal observers about their motivations for volunteering as legal observers, and have commented about their green hats.

151.     While several police officers have consistently been courteous and respectful to legal observers including Plaintiffs over the years, a certain number of police officers have

consistently been hostile to legal observers specifically, by regularly threatening to arrest them for things that are not crimes, such as standing on street corners and observing police interact with protest groups.

152.   Legal observers wearing green hats attended more than one hundred separate protests that occurred within the St. Louis City limits from 2015 until October, 2017.

153.   On September 17, 2017, after SLMPD officers seized Plaintiff Kampas, an officer removed Kampas's neon green legal observer hat from Kampas's head, and the police officer placed it on his own head, saying "look, I am a communist," and they called Kampas a communist, and laughed at him, and pointed at him.

154.   That police officer passed the green hat to another officer, who put it on his own head as well.

155.   While they were doing this, police officers took still images and/or videos of Kampas with their personal and/or department issued cellphones, and they took turns taking pictures of themselves wearing Kampas's hat as well.

156.   Police officers were intentionally mocking Kampas.

157.   Police officers associated the neon green legal observer hats with "communists," because historically, the National Lawyers Guild did in fact represent persons accused of communism before the House Committee on Un-American Activities.

158.   SLMPD officers associated the green legal observer hats with a disfavored political group, "communists."

159.   SLMPD officers arrested Kampas and Hoffmann because those police officers disapproved of the National Lawyers Guild, and disapproved of legal observers who wear neon green hats when people protest against police actions.

160.    When Plaintiff Hoffman was arrested without probably cause on October 12, 2014, at the protest at QuickTrip, Hoffmann was wearing a neon green legal observer hat.

161.    When Sgt. Kimberly Allen was arresting Plaintiff Hoffmann for attempting to make an internal affairs report about police brutality he had witnessed, Sgt. Allen told Hoffmann that she believed that the legal observers who wear green hats are all "anarchists," and that she didn't respect "anarchists."

162.    Sgt. Kimberly Allen associated the green legal observer hats with a disfavored political group, "anarchists."

163.    On October 12, 2014, Sgt. Kimberly Allen told Hoffmann "I can arrest you any time I see you."

164.    Police arrested Plaintiffs on October 3, 2017 because Plaintiffs were exercising their First Amendment Rights, because police despise legal observers, because police associated Plaintiffs' green hats with disfavored political groups, and because Plaintiffs were attempting to record the actions of police.

## COUNT I: VIOLATION OF PLAINTIFFS' FIRST AMENDMENT RIGHT TO FREEDOM OF SPEECH (42 U.S.C. §1983)

Count I is directed against all Defendants. Plaintiffs incorporate by reference the allegations in the foregoing paragraphs of this Complaint as if fully set forth herein.

165.    Plaintiffs were not protestors.

166.    Plaintiffs were legal observers and third-party observers of the protest who were engaged in constitutionally protected activity when they attended a lawful assembly on public streets and sidewalks for the purpose of documenting a public protest.

23

167.    Defendants violated Plaintiffs' rights under the First Amendment to freedom of speech by interfering with Plaintiffs' ability to gather information and cover a matter of public interest and concern as legal observers documenting the protests of the *Stockley* Verdict.

168.    Observing and recording public protests, and the police response to those protests, is a legitimate means of gathering information for public dissemination that is protected by the freedom of speech and freedom of the press clauses of the First Amendment, as applied to the states under the Fourteenth Amendment to the United States Constitution.

169.    Defendants engaged in these unlawful actions willfully and knowingly, acting with reckless or deliberate indifference to the Plaintiffs' First Amendment rights.

**WHEREFORE**, Plaintiffs respectfully request this Court:

a.    Enter judgment in favor of Plaintiffs and against the Defendants;

b.    Award Plaintiffs monetary damages in an amount that is fair and reasonable to compensate them for the damages they have suffered, including nominal and compensatory damages, and punitive damages against Defendants Kegel, Larson, Lemons, Hawkins, and McNamara for their violation of Plaintiff's clearly established First Amendment rights under color of state law;

c.    Award Plaintiffs reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and any other applicable provisions of law; and

d.    Allow such other and further relief as the Court deems just and proper.

## COUNT II: FIRST AMENDMENT RETALIATION (42 U.S.C. §1983)

Count II is directed against all Defendants. Plaintiffs incorporate by reference the allegations in the foregoing paragraphs of this complaint as fully set forth herein.

170.    Plaintiffs were legal observers acting as third-party observers who were engaged in constitutionally protected activity when they were documenting the public protests relating to the *Stockley* Verdict and the police response thereto.

171.    The City of St. Louis retaliated against Plaintiffs for engaging in constitutionally protected activities of freedom of speech and freedom of the press.

172.    Plaintiffs now reasonably fear being unlawfully seized and arrested in an arbitrary and/or retaliatory manner if they observe a protest in the City of St. Louis.

173.    Plaintiffs now reasonably fear that they will be subjected to interference with their right to record the police if they observe a protest in the City of St. Louis.

174.    These acts of the SLMPD described herein would chill a person of ordinary firmness from continuing to engage in a constitutionally protected activity, and they have, in fact, chilled Plaintiffs from continuing to peacefully observe and document these protests.

175.    Defendants' arrest of Plaintiffs was because they exercised their First Amendment rights.

176.    It was the custom or policy of the City of St. Louis, as well as the City's failure to train and supervise its officers and/or the City's explicit or implied direction to Defendants, that caused the First Amendment retaliation.

177.    As a result of the Defendants retaliation the Plaintiffs were damaged.

**WHEREFORE**, Plaintiffs respectfully request this Court:

a.  Enter judgment in favor of Plaintiffs and against Defendants;

b.  Award Plaintiffs monetary damages in an amount that is fair and reasonable to compensate them for the damages they have suffered, including nominal and compensatory damages, and punitive damages against Defendants Kegel, Larson,

Lemons, Hawkins, and McNamara for their violation of Plaintiff's clearly established

First Amendment rights under color of state law;

c.    Award Plaintiffs reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988

and any other applicable provisions of law; and

d.    Allow such other and further relief as the Court deems just and proper.

### COUNT III: FOURTH AMENDMENT VIOLATION FOR UNLAWFUL SEIZURE (42 U.S.C. §1983)

Count III is directed against all Defendants. Plaintiffs incorporate by reference the

allegations in the foregoing paragraphs of this Complaint as fully set forth herein.

178.    Plaintiffs have a right under the Fourth Amendment to be free from unreasonable

seizures, as applied to the states under the Fourteenth Amendment to the United States

Constitution.

179.    Plaintiffs were seized by Defendants when they intentionally terminated their

freedom of movement without justification, and zip-tied or handcuffed their hands behind their

backs.

180.    The employment of "kettling" without warning was objectively unreasonable and

constituted an unlawful seizure.

181.    Plaintiffs had committed no crime, and there was no objectively reasonable belief

that Plaintiffs had committed a criminal offense, nor was there even arguable probable cause for

their arrests.

182.    Plaintiffs put senior and high-ranking SLMPD commanders on notice directly that

they had not committed any crime, and that no probable cause existed to arrest them.

183.    Plaintiffs posed no threat to the safety of any police officer or any other person.

184.    Plaintiffs had a Constitutional right to be free from false allegations that they had committed a crime.

185.    It was clearly established at the time that arresting a person in the absence of probable cause violates the Fourth Amendment.

186.    Defendants engaged in these unlawful actions willfully and knowingly, acting with reckless or deliberate indifference to Plaintiff's Fourth Amendment rights.

187.    It was the custom or policy of the City of St. Louis, as well as the City's failure to train and supervise its officers, that caused the unlawful seizures.

**WHEREFORE**, Plaintiffs respectfully request this Court:

a.   Enter judgment in favor of Plaintiffs and against the City of St. Louis;

b.   Award Plaintiffs monetary damages in an amount that is fair and reasonable to compensate them for the damages they have suffered, including nominal and compensatory damages, and punitive damages against Defendants Kegel, Larson, Lemons, Hawkins, and McNamara for their violation of Plaintiff's clearly established Fourth Amendment rights under color of state law;

c.   Award Plaintiffs reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and any other applicable provisions of law; and

d.   Allow such other and further relief as the Court deems just and proper.

## COUNT IV: FAILURE TO INSTRUCT, TRAIN, SUPERVISE, CONTROL, AND/OR DISCIPLINE AGAINST THE CITY OF ST. LOUIS AND ST. LOUIS METROPOLITAN POLICE DEPARTMENT COGNIZABLE UNDER 42 U.S.C. § 1983

Count IV is directed against The City of St. Louis. Plaintiffs incorporate by reference the allegations in the foregoing paragraphs of this Complaint as fully set forth herein.

188.     Defendants violated the constitutional rights of Scott Kampas and Steven Hoffmann as set forth herein.

189.     There exists within the Police Department and/or the City policies or customs, practices and usages that are so pervasive that they constitute the policies of this Defendant, that caused the constitutional deprivations of Scott Kampas and Steven Hoffmann as set forth herein. The policies, customs, practices, and usages that exist are:

   a.   To arrest those in and around lawful assemblies without reasonable cause or provocation and in violation of their constitutional rights;

   b.   To ignore the policies and procedures of SLMPD and/or the Police Department, by encouraging and/or permitting the false arrests of attendees at lawful assemblies;

   c.   To fail to adequately train, supervise, and/or discipline police officers and/or City officials concerning the practices aforementioned, to assure compliance with City and/or Department policy, state and federal laws, and the Constitution of the United States.

190.     Alternatively and without waiver of the foregoing, the City's training program was not adequate to train its officers and officials to properly handle reoccurring situations like the one involving Scott Kampas and Steven Hoffmann, and therefore, the City had a policy or custom of failing to adequately train employees/officials of the City and/or Department.

191.     The City and/or the SLMPD knew that more and/or different training was needed to avoid the false arrests of those who are in and around lawful assemblies and other constitutional deprivations of the Plaintiffs.

192.     The Department was on notice through its highest-ranking officials who had personally witnessed and/or coordinated false and retaliatory arrests without probable cause that officers needed further and additional training.

193.     The City is ultimately vested with the duty, power and authority to train, supervise, discipline and otherwise control the officers of the Police Department.

194.     The City failed in its duty to so train, supervise and discipline Defendants in general and specifically so as to conform their conduct with constitutional requirements.

195.     Specifically, the City failed to adequately train, supervise and discipline officers of the Police Department/agents of the City in the proper and lawful arrests of subjects; failed to train, supervise and discipline officers with regard to the duty to intervene and/or report transgressions, and to truthfully respond to inquiries.

196.     The City effectively abrogated the power to train, supervise, discipline and control officers of the Police Department/agents of the City, resulting in the constitutional deprivations to Scott Kampas and Steven Hoffmann as set forth above.

**WHEREFORE**, Plaintiffs respectfully request this Court:

    a.   Enter judgment in favor of Plaintiffs and against the City of St. Louis;

    b.   Award Plaintiffs monetary damages in an amount that is fair and reasonable to compensate them for the damages they have suffered;

    c.   Award Plaintiffs reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and any other applicable provisions of law; and

    d.   Allow such other and further relief as the Court deems just and proper.

## CONCLUSION

WHEREFORE, Plaintiffs Scott Kampas and Steven Hoffmann pray for judgment against the Defendants on all counts, for an award of money damages against them for compensatory damages in an amount that is fair and reasonable, for punitive damages against Defendants Kegel, Larson, Lemons, Hawkins, and McNamara, for the costs of this action, including reasonable attorney's fees; and for such other and further relief as the Court deems fair and appropriate under the circumstances.

Respectfully submitted,

NEWTON BARTH, L.L.P

By:      */s/ Steven S. Hoffmann*
Talmage E. Newton IV 56647MO
Steven S. Hoffmann 74445MO
555 Washington Ave. Suite 420
Saint Louis, MO 63101
(314) 272-4490 – Telephone
(314) 762-6710 – Facsimile
talmage@newtonbarth.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and accurate copy of the foregoing was filed via the Court's electronic filing system on this 15th day of June, 2023.

 */s/ **Steven S. Hoffmann***

30